ON PETITION FOR REHEARING.
PETITION DENIED.
3. The appellants' petition for a rehearing says:
 "The Court erred in stating on page 9 of its opinion, `There is no evidence that Jacob Denn owned any property in that section 23).' (See plaintiffs' Exhibit J)."
Exhibit J was the inventory filed in the estate of Jacob Denn, deceased. It was signed in 1915 and listed the property which the deceased owned at the time of his death in 1915. The list included some land in Section 23, but, of course, does not indicate when it was acquired. As stated in our previous opinion, in language which the petition does not challenge, Jacob Denn received a deed in 1893 which conveyed to him approximately 1,000 acres of land lying in Sections 25, 26 and 35. The deed conveyed nothing situated in Section 23. One year after he received the conveyance *Page 27 
just mentioned he gave to his son, Henry J. Denn, the quarter section across which, our previous opinion held, he reserved an easement in the form of a road. The reservation which we recognized was not by express grant, but by implication. So far as the record indicates, Jacob Denn owned nothing in Section 23 when he made the gift. In determining whether or not the parties intended to reserve to Jacob Denn, the conveyor, an easement across the conveyed land, the court is, of course, controlled by the facts and circumstances as they existed at the time of the gift, that is, in 1894.
We do not know when Jacob Denn came into ownership of the property in Section 23 which the inventory lists. When we wrote our criticized sentence, we assumed that all would understand that we had reference to the crucial year, 1894. The facts mentioned in Exhibit J are immaterial.
The petition for a rehearing also says:
 "The court erred in ruling that the Amstein Road was never opened as it is the understanding of the petitioners that appellants' Exhibit 1 includes an order of the County Court opening the road which made the road a public road whether or not it was ever improved by the County."
After receipt of the petition for a rehearing, we read the transcript of evidence again and once more examined all of the exhibits. The latter consist in large part of copies of deeds and other records. During the trial the court received in evidence, upon the proffer of appellants, copies of a county court record which was intended to establish as a public road a thoroughfare to be known as the Amstein Camas Valley Road. The record comprised many documents and the exhibit consisted of copies of the latter. The copies, *Page 28 
with the exception of one, were photostatic and all of the latter were fastened together. The single exception was a typewritten copy of an order which we will presently quote. It was not attached to the others. Across the top of the first page of the photostatic copies was written in large script this appellation: "Amstein Camas Valley Road." The single unattached typewritten sheet had no appellation.
The brief which the appellants filed when this cause was submitted mentioned no part of any of the records just designated. It did not allude to Exhibit 1 or to any document included within it and nowhere employed the name, Amstein Camas Valley Road. Before quoting the sole reference in the brief to that road, we explain that the word "roadway" and the phrase "another route to the county road through his own `back pasture'" in the quoted passage do not refer to the Amstein Camas Valley road. We now quote from the brief:
 "Furthermore, at the time of the deed, the roadway, if there was such, was not necessary to the beneficial enjoyment of the land deeded or the land retained since Jacob Denn, the ancestor, and the executor of his estate after his death preferred to use another route to the county road through his own `back pasture' and over his own property which lays west and north of the appellants' property as included in the 1894 deed (Tr. 60, 61, 67). This does not even mention the other routes south and east of the respondents' property (Tr. 58, 62, 63, 66)."
Thus, the only allusion in the entire brief to the purported Amstein Camas Valley road was this: "the other routes south and east."
Due to the above circumstances, we overlooked *Page 29 
the typewritten copy of the part of the County Court's record which the appellants' petition for a rehearing mentions. The material part of that record follows:
"Friday, May 8th, 1903:
 "In the Matter of the | Rudolph Amstein-Camas SECOND READING Valley Road |
 "Now at this time comes on for reading the report of the viewers upon the Amstein Camas Valley road. Report being favorable, the road is ordered opened.
 (Journal signed) M.D. Thompson, Attest: Judge. D.R. Shambrook, Clerk."
We explained the circumstances in order to show how it happened that we overlooked the order and for the purpose of suggesting that whenever an exhibit consists of several papers they should be fastened together and marked in such a manner that they will be a unit. A brief should refer to an exhibit by an identifying name or symbol whenever reliance is placed upon it.
In view of the fact that the appellants' brief did not depend upon the alleged Amstein Camas Valley road, we would have been justified in ignoring the purported road, but since it commanded attention during the trial in the Circuit Court, our opinion gave it consideration.
When the order above quoted was made, § 4785, Bellinger and Cotton's Code, was in effect. The material part of that section is quoted in our original opinion. We do not believe that the order which the County Court entered met the requirements of *Page 30 
§ 4785. It did not declare that the court was "satisfied that such road will be a public utility" nor did it order that the "report, survey and plat" be recorded. But, even if the order could be deemed adequate, still we do not believe that the order alone helped the appellants' cause.
Normally, an easement in the form of a way of necessity terminates when the necessity ceases, as through the construction of a public thoroughfare which serves the dominant estate. Since it was in 1894 that the father gave his son the quarter section over which it is said he reserved a roadway, the easement was created in that year — if it was created at all. The order which it is claimed created the Amstein Camas Valley road was not signed until 1903. The appellants claim that it terminated the necessity for using the easement and thereby extinguished the easement. As our previous opinion points out, the Amstein Camas Valley road was never improved. The route which the surveyors selected for it remained in its natural state and was still in that condition on the day of the trial. For one to reach the respondents' land from the county road by means of the route surveyed for the unbuilt Amstein Camas Valley road would have necessitated travel for about a mile and a half through primeval land and, unless we are mistaken, over an unbridged stream. Our previous decision quotes from the testimony of Mr. A.F.C. Frear, who for 26 1/2 years has been the roadmaster of Douglas County, that the county never spent a cent upon the purported Amstein Camas Valley road. He referred to the latter as "a paper road." The trial judge who, as our opinion says, visited the area in which the properties in controversy are situated, could find no *Page 31 
trace of the Amstein Camas Valley road. Although diligent efforts were made by the appellants to show that this or that person had traveled upon some part of the so-called Amstein Camas Valley road, no one testified that he had done so. Even the name was a stranger in the ears of some of the witnesses. Plainly the route was never used or traveled.
In 1903, when the order which the petition cites was entered, the road upon which the respondents depend was twenty or so years old and had served Jacob Denn for nine years. We do not think that the mere adoption of the order of the County Court above quoted ended the necessity to use the road. The necessity was unaffected by the adoption of the order. The latter, if valid, and we do not think that it was, was immaterial to the issues of this case. Had the contemplated road been rendered usable, that fact would have been material.
The fact that the appellants' petition for a rehearing mentions the above details indicates that they misconstrued our opinion. In inferring that the father reserved, and that the son granted to the father, an easement over the conveyed land, we did not draw our inference from necessity alone. The necessity for a passageway was only one of the circumstances which we deemed significant. It may be that our use of the term "way of necessity" misled the appellants. That type is only one form of an implied easement. We will attempt to make matters clearer by going over some phases of the case again.
We did not interpret the evidence as indicating that when Jacob Denn, in 1894, gave to his son the quarter section over which the respondents claim he reserved an easement, the property which the father *Page 32 
retained west and southwest of the conveyed quarter section was landlocked. We thought that we made it clear that the father owned land to the north and east of the quarter section. That land extended all of the way to the county road which is indicated upon the plat which accompanies our previous decision. Possibly the father could have made his way to the county road by going over that land. The distance was about two miles. As nearly as we can glean from the record, the land north and east of the conveyed quarter section was partially covered with timber and crossed by a stream. It is through that area that the father would have been compelled to wend his way in going from the land which the respondents now own to the county road. No witness testified that anyone ever took that course, but, in theory at least, it was possible. Witnesses spoke of the "back pasture" route, but, as our previous decision indicates, that route went through Section 23, and it does not appear that the father owned any land there in 1894. Our opinion reviewed the testimony of witnesses who swore positively that the only means of getting from the land which the respondents now own to the county road was by means of the lane which our decision recognized as an easement. Very likely those witnesses, who were farmers and settlers, were concerned with practical matters and not with a theoretical way of going through the untamed land. We think that their testimony reflects the truth. We know of nothing in the record which shows that anyone drove a wagon from the property now owned by the respondents to the county road by any route except over the lane which we held is an easement. We reviewed these phases of the evidence again for the purpose of making it clear that (1) when *Page 33 
the father gave to his son a deed to the quarter section, the land which the respondents now own was not landlocked; and (2) the only practical method of going from the land now owned by the respondents to the county road was over the alleged easement.
As we have said, Jacob Denn in 1893 purchased a piece of land comprising one thousand acres which included the tracts now owned by the appellants and the respondents. It embraced all of the land over which the road extends. The thousand-acre tract was, roughly speaking, rectangular in shape and the road somewhat paralleled the longer sides of the rectangle. The road was nothing more than a wagon road in 1893, but its contours were plainly visible. Witnesses, in mentioning it, spoke of fences, gates and a cattle guard. Hence, it seems permissible to infer that the course of the road was defined, not only by the clearings through which it ran and the wagon tracks left behind by vehicles which had passed over it, but also by stretches of fence. The road was used by those who had occasion to leave the county road and visit the land which lay west of it comprising that which Jacob Denn acquired in 1893 and other land beyond his. The western extremity of the road was in the 40-acre tract which the respondents now own. Its eastern end was in the county road to which we have made frequent reference. Thus, the entire length of the road, about two miles, was upon property of which Jacob Denn was the owner.
Frequently when the owner of real property so employs it that one part of it receives a service which another part renders through the medium, for example, of a drain or a road, we term the road or drain a quasi easement in order to express more readily the *Page 34 
manner in which the favored part has become dominant and the other servient. When, in such instances, we use the term quasi easement, we realize the inaccuracy and recognize that normally no one can possess an easement over land which he himself owns. Yet the term quasi easement, when used in such situations, facilitates understanding.
In 1893, as we have seen, the western extremity of the road in question was in the 40-acre tract which the respondents now own, but which Jacob Denn had purchased in that year. When the road left that tract it shortly entered and then crossed the quarter section which the appellants now own, but which Jacob Denn then owned. Had Denn been familiar with legal terms and principles, he would have deemed the 40-acre tract as the dominant tenement, the quarter section as the servient tenement and the road as a quasi easement. The terms would have been inaccurate, but they would have served their purpose.
One year after the father made his purchase and the property had assumed the features which we just described, he gave to his son, Henry J. Denn, the quarter section which the appellants now own. We have just deemed it as the servient tenement. The conveyance severed the ownership and made possible a technical easement with its accompaniment of dominant and servient estates. The question which this appeal propounds is this: When the father made that gift, did he then intend to forego the road, surrender up his right to use it and authorize his son to erect a barrier where the road leading from the dominant tenement entered the servient one? Or did father and son intend to preserve the relationship of the two tenements to each other and reserve to the father an *Page 35 
easement across the conveyed property so that he could get in and out of his retained land without constructing a new road about two miles long?
We shall mention another fact. It received attention in our previous opinion. When the son received the conveyance of the quarter section, he had no way of getting to his property without using the very road with which we are concerned. The quarter section was completely landlocked. On three sides of it lay land owned by the father and on its fourth side was an area held by strangers. The road in question, after originating upon the 40-acre tract now owned by the respondents and crossing the quarter section, extended a mile easterly over lands held by the father, and in that manner reached the county road. Thus, the son himself needed a way of necessity, and the road in question was the very right of way which he required. It appears that he and his successors, the appellants, have constantly used it. It can, therefore, be inferred that when the father gave his son the quarter section he also gave him, as an appurtenance to the quarter section, an easement across the father's large tract to the east. That easement, in the form of a way of necessity, was a one-mile stretch of the road with which we are concerned.
When the dispute about the road arose about four years ago, both father and son were dead and, hence, no help could come from their lips. When the transaction between them took place nothing was written except the deed and, as our previous opinion states, it included a warranty. The latter is adverse to the respondents' contentions, but not fatal to them.
The evidence which indicates whether or not the father reserved, and the son granted, the alleged easement must be found in the circumstances which attended *Page 36 
the making of the gratuitous conveyance. There is nothing novel about the fact that we must look to circumstantial evidence, for the courts frequently resort to evidence of that kind.
The circumstances which show whether or not father and son intended that the road should remain open to the former are these: (1) The father after giving his son the quarter section still owned property west and southwest of the conveyed quarter section. (2) The conveyance to the son was unaccompanied by any consideration and was a gift. (3) The father had no practical means of access to or egress from his land west and southwest of the conveyed quarter section except by the road. (4) The son, after receiving the quarter section, had no means of going to or from it except over the part of the road which lay upon property owned by the father east of the quarter section; in other words, he had need of a way of necessity over the father's land. (5) The road had been in use for many years; its contours were well defined and plainly visible; its purposes were self-evident. (6) The land which the father retained west and southwest of the conveyed land lay almost two miles from the county road, and although no witness estimated the cost of building a road from the retained land to the county road, it is obvious that the cost would have been large. (7) The land over which the easement is claimed is the conveyed land. (8) Since the son had need for the part of the road which lay upon his father's land east of the quarter section, the easement in its entirety extended over land owned by both the father and the son.
The authorities devote much space to a delineation of the circumstances under which an implication may *Page 37 
be drawn that a quasi easement became a technical one upon severance of ownership. It is apparent that discord exists in the decisions and that many of them employ rules difficult of application.
In 28 C.J.S., Easements, § 34, page 694, it is said:
 "Where the owner of an entire tract of land or of two or more adjoining parcels employs a part thereof so that one derives from the other a benefit or advantage of a continuous, permanent, and apparent nature, and sells the one against which such quasi easement exists, such easement, if necessary to the reasonable enjoyment of the property retained, is, under what is perhaps the more generally accepted rule, impliedly reserved to the grantor, no distinction being made between the circumstances under which an easement is regarded as impliedly granted and those under which one is regarded as impliedly reserved. Other authorities, however, urge that a grantor should not be permitted to derogate from his grant and accordingly in many jurisdictions the rule is established that, where there is a grant of land without express reservation of easements, there can be no reservation by implication, unless the easement is strictly one of necessity, particularly where the grant is with full covenants of warranty."
Thompson on Real Property, Perm. Ed., § 502, says:
 "The authorities are in conflict as to the degree of necessity required to create an easement of way by implication on the severance of an estate. In this country, the cases usually hold that to create an easement of way by implied grant it must be necessary to the proper enjoyment of the land, or reasonably necessary, according to the weight of authority. There are cases which hold that the way must be strictly necessary. * * * A right of way has no existence during the continuance *Page 38 
of unity of seizin, and upon severance of the tenement, it does not pass unless it is a way of necessity or the operative words of the conveyance are sufficient to grant it de novo. Upon conveyance of a parcel of land, the grantor retains no right of way over it to and upon his adjoining land, unless he expressly reserves the right, or it is implied as a way of necessity, although there is existing a way over the granted land, which has been known as a street, and was so marked on a plan. * * * A way of necessity to and from lands otherwise inaccessible is created, not because indispensable to the grantee, but it arises by implication of law in order to effectuate the presumed intention of the parties. It does not rest on mere convenience or unusual benefit. Thus, if one conveys a part of his land to another in such form as to deprive himself of access to the remainder, there is a legal presumption that the conveyance was with the understanding of the parties that the grantor reserved a way across the portion conveyed. * * *."
Tiffany, Real Property, 3d Ed., § 781, states:
 "If the owner of land, one part of which is subject to a quasi easement in favor of another part, conveys the quasi dominant tenement, an easement corresponding to such quasi easement is ordinarily regarded as thereby vested in the grantee of the land, provided, it is said, the quasi easement is of an apparent, continuous and necessary character. The conveyance of a thing imports a grant of it as it actually exists at the time the conveyance is made, unless the contrary intention is manifested in the grant. It has been started that `the moment a severance occurs by the sale of a part, the right of the owner to re-distribute the properties of the respective portions ceases and easements or servitudes are created corresponding to the benefits and burdens mutually existing at the time of the *Page 39 
sale. This is not a rule for the benefit of purchasers, only, but is entirely reciprocal. Hence, if instead of a benefit conferred a burden has been imposed upon the portion sold, the purchase, provided the marks of this burden are open and visible, takes the property with a servitude upon it. The parties are presumed to contract in reference to the condition of the property at the time of the sale, and neither has a right, by altering arrangements then openly existing to change materially the relative value of the respective parts.'
 "It is perhaps unfortunate that the courts, in determining whether, in a particular case, an easement corresponding to a pre-existing quasi easement has passed with the land, having usually failed to recognize that the question is primarily one of construction, and have instead undertaken to lay down absolute rules as to what characteristics the particular easement or quasi easement must have, implying that, if it has these characteristics, the easement will pass as a matter of law. The characteristics ordinarily referred to in this connection are, as above indicated, that the user be apparent, that it be continuous, and that it be necessary, each of which will be hereafter discussed in turn. But it does not seem that the presence or absence of any or all of these characteristics should be conclusive. * * *"
From 17 Am. Jur., Easements, § 34, page 948, we take the following:
 "Various elements are essential to create an easement by implication upon the severance of the unity of ownership in an estate. They are: (1) A separation of the title; (2) necessity that, before the separation takes place, the use which gives rise to the easement shall have been so long continued and obvious or manifest as to show that it was meant to be permanent; and (3) necessity that the easement be essential to the beneficial enjoyment *Page 40 
of the land granted or retained. Another essential is sometimes added to these — namely, that the servitude be continuous, as distinguished from temporary or occasional. * * *"
It is seen from the passages which we quoted from the above authorities that the courts have employed various conflicting tests in determining whether upon severance of ownership a quasi easement became a technical one. One of the tests, it will be noticed, was whether or not the servitude was continuous or discontinuous. German Savings Loan Society v. Gordon, 54 Or. 147, 102 P. 736, bestowed considerable analysis upon the distinction between a continuous and a discontinuous servitude, and then held:
 "We are unable to discover any valid reason for a distinction in the rules of law applicable to servitudes depending upon whether they are continuous or discontinuous, except in the matter of the greater conspicuity which the former usually affords. An artificial ditch in which water regularly flows must necessarily be a constant reminder to all beholders of the changed condition of the surface of the earth whereby the dominant tenement is drained or irrigated by the conduit which is appurtenant thereto. * * * A discontinuous quasi easement when evidenced in a similar substantial manner ought to pass by implied grant as an appurtenant to the dominant tenement when the latter is severed by a conveyance thereof."
To that extent at least that decision simplified the test for determination whether or not the parties intend, when severance of ownership occurs, that an existing servitude should become an easement. "Continuous or discontinuous" is no longer the test in this *Page 41 
state. "Conspicuity" was substituted by that decision for that phase of the text. Restatement of the Law, Property, § 476, expresses that feature of the test thus:
 "(h) the extent to which the manner of prior use was or might have been known to the parties."
The German Savings Loan Society decision was concerned with still another detail of the test. The case involved lots 1, 2, 7 and 8 of a subdivision of Portland. Lots 1 and 2 fronted upon Hood Street; lots 7 and 8, immediately to the rear of those lots, fronted upon Corbett Street. Upon lots 1 and 2 stood a dwelling house facing Hood Street. It was occupied by one Mrs. Leaner Gray, owner of the lots. In 1891 she conveyed lot 7, with the exception of a strip 5.125 feet wide off its north side, to the defendant who presently improved the part conveyed to him with dwelling house. Mrs. Gray converted the narrow strip she reserved into a passageway leading from Corbett Street to the rear of her house. Thus, her house, fronting as it did upon Hood Street, had access by means of the passageway to Corbett Street. The passageway was 5.125 feet wide and about 90 feet long. Later, Mrs. Gray mortgaged lots 1, 2 and 8 to the plaintiff, and still later defaulted in meeting the mortgage indebtedness. Through foreclosure sale the plaintiff became the owner of lots 1, 2 and 8. After the foreclosure sale and after a deed had been delivered to the plaintiff, Mrs. Gray conveyed to the defendant the fractional strip we have mentioned. The defendant then closed the passageway. This court affirmed the decree of the Circuit Court which held that the servitude to which Mrs. Gray subjected the strip when she was owner of the entire estate became an easement upon severance *Page 42 
of ownership. In so doing and in affirming the award of an injunction, the decision said:
 "In the case at bar, though the plaintiffs' tenants can pass over its own land across lot 8 to Corbett street, so that the passageway is not an absolute necessity, we are satisfied that the stairs and walk as laid by Mrs. Gray serve as a more convenient way, and believe them to be reasonably necessary to the enjoyment of the property * * *."
That language renders it clear that reasonable necessity suffices. It should be observed that notwithstanding Mrs. Gray's home fronted for the width of two city lots upon Hood Street, access to Corbett Street by means of the contested passageway was sustained. That decision is by no means a novelty. Several others to like effect from other jurisdictions could be cited. Each depended, in part, upon the element of necessity although, in defining the latter, terms like "necessary for convenience and comfortable enjoyment" were used. Therefore, in the present instance, even though Jacob Denn might have been able to reach the county road through the back pasture, that circumstance would not in itself be fatal to the alleged easement.
By reverting to our original decision, it will be seen that it quoted in large part the test written by Restatement of the Law, Property, § 476. We believe that that test is in harmony with our prior opinions, although its phraseology is an improvement over the language which they employed. That test permits courts which are confronted with an alleged implied grant or reservation of an easement to give proper weight to all the evidence which bears upon the intention of conveyor and conveyee. It will be recalled *Page 43 
from the passage we quoted from Tiffany on Real Property that that writer deemed it "unfortunate that the courts, in determining whether in a particular case, an easement corresponding to a pre-existing quasi easement has passed with the land, have usually failed to recognize that the question is primarily one of construction." The rule offered by the Restatement deems the question one of construction and permits the courts to weigh all of the circumstances attendant upon the conveyance for the purpose of determining whether conveyor and conveyee intended that an easement should be created. So-called necessity is only one of the items to which attention should be given. In some instances, like those in which (1) an adequate consideration was paid, (2) the claimant is the conveyor and executed a warranty deed, (3) no reciprocal benefits resulted, and (4) the servitude was not clearly defined, necessity must be more pressing than in instances where other elements speak up in behalf of the alleged easement. The test suggested by the Restatement is merely a method of determining from the available circumstantial evidence whether or not conveyor and conveyee intended when the conveyance took place that a servitude, then in existence, should be preserved as an easement. If the parties had no thoughts at all upon the subject, then, since no easement was intended, none can be awarded by the court's decree. If they intended that the servitude should become an easement, the court's decree should give effect to their wishes.
As stated in our previous decision, we think that the circumstances clearly indicate that father and son intended that the existing servitude should remain as an easement, affording the father access to the county *Page 44 
road from the land which he retained west and southwest of the tract he gave to his son.
The above suffices for a consideration of everything submitted by the petition for a rehearing. The petition is denied.
Page, J., did not participate in this decision.
Bailey, J., dissents.